## OCTOBER TERM, 1856.

## J. W. RIXMAN & CO. vs. W. GOODALE, Collector General of Customs.

Hong Kong, although a British possession, is a " port in China," within the meaning of the Act of May 24th, 1853, increasing the duties on goods coming from China and the Philippine Islands.

The following is the judgment of the Court:

This is an action brought to recover the sum of eight hundred and forty-five 14-100 dollars, with interest, which sum the plaintiffs allege was a surcharge of 10 per cent. on duties paid by the plaintiffs under protest, upon certain Chinese goods imported by them in the Danish ship " Asa Thor," from Hong Kong, in September, 1854.

For our views in relation to the first point made by the plaintiff's counsel, namely, that under the 6th Article of the Treaty with France, Chinese goods when brought from a French possession, cannot be subjected to a higher duty than five per cent. ad valorem, and that by parity of right such goods ought not to be subjected to a higher rate of duty when brought from a British possession, we beg to refer to our decision in the case of Melchers & Co. vs. the Collector General of Customs, which is a case precisely similar to this. That decision will be found published in the "Polynesian," of May 17, 1856. Fortunately, the negotiators and framers of the French Treaty of 1846 are still living, and the present representatives of the governments contracting that treaty; and it will be readily admitted that their united

opinion upon the proper construction of the treaty is of the highest authority on the question of its true meaning.    Mr. Perrin and Mr. Wyllie, who framed the Treaty, agree in the opinion, that under a proper interpretation of the 6th Article of the Treaty, the privilege of 5 per cent. duty "consecrated by the sixth Article, is limited to goods of French origin," and does not extend to foreign goods, though brought from a French possession.    We see no good reason to doubt the correctness of their opinion.    What is claimed by France, the most favored nation, may equally be claimed by Denmark—but no more; and the goods imported in the " Asa Thor," being of Chinese and not of Danish origin, are not by virtue of the French treaty entitled to the privilege of 5 per cent. *ad valorem,* for which the plaintiffs contend.

We now come to the second point, the only one on which the plaintiffs have made any firm and decided stand, namely: that, granting the construction put upon the French treaty by the framers thereof to be correct, still it is quite irrelevant to the question at issue, because the right to levy a duty of 15 per cent. on Chinese goods does not depend upon any treaty stipulations, but upon the law of May, 1853, a careful consideration and construction of which excludes the idea of imposing a duty of 15 per cent. upon goods brought from Hong Kong, inasmuch as Hong Kong is not a port " of " or " in " China. In other words, they contend that the statute which imposes the duty of 15 per cent. does not cover any goods except those imported from a port of or in China, or the Philippine Islands; and that Hong Kong is not a port of or in China, or the Philippine Islands, but a British possession, and that consequently goods brought from thence, whatever their origin, are not within the scope of the statute.

The statute in question reads as follows:

" An Act to increase the Import Duties on certain kinds of Merchandise.    Approved May 24th, 1853.

"Be it enacted by the King, the Nobles, and the Representatives of the Hawaiian Islands, in Legislative Council assembled:

" Section 1.    That there shall be levied on all goods, wares and merchandise, imported into this kingdom from any port in China or the Philippine Islands, a duty of fifteen per cent. *ad valorem* upon the invoice cost thereof; provided, however, that no more than five per cent. duty shall be levied upon the article of Rice, and further provided that this shall not be construed into a repeal of any part of ' An Act levying specific duties on sugar, syrups of sugar, and coffee,' passed June 6th, 1852.

"Section 2.    The increase of duties provided for in the first section of this Act, shall not affect goods, wares and merchandise which are the growth or manufacture of any foreign country having a treaty with this kingdom.

"Section 3.    In order to prove that any goods, wares or merchandise, imported into this kingdom from any of the ports of China or the Philippine Islands, are the growth or manufacture of some other country having a treaty with this kingdom, it shall be necessary for the person entering the same at the Custom House to present to the Collector of Customs a certificate to that effect from the resident Hawaiian Consul, or in default of such Consul, from the Consul or Commercial Agent of such other country, at the port in China or the

Philippine Islands from whence such goods, wares or merchandise shall have been brought to this kingdom; and the person entering the same at the Custom House shall make oath that such goods, wares and merchandise are not the growth or manufacture of China or the Philippine Islands, to the best of his knowledge and belief.

"Section 4. This Act shall take effect at the expiration of six months from the date of its publication in the "Polynesian" newspaper."

By a fair reading of this whole statute, we think it must be evident to every one that the leading idea and intention of the Legislature was to increase the duties on goods the growth or manufacture of China, or the Philippine Islands. It was the kind of merchandise, rather than the place from which it was to be brought, that the Legislature had in its mind at the time of passing the law; and this appears not only from the body of the Act, but also from the title, which is "An Act to increase the import duties on certain kinds of merchandise." At, and previous to, the time of passing the Act, large quantities of goods were imported into these Islands from Hong Kong and Manila, consisting of silks, cigars, &c., which were considered as luxuries, and it was thought right and proper that they should be subjected to an increased duty, and the Legislature accordingly enacted the statute in question.

But it is said that nevertheless we must keep to the strict wording of the statute, which imposes the duty of 15 per cent. upon such merchandise, only when "imported into this kingdom from any port in China or the Philippine Islands," and that Hong Kong is not such a port within the meaning of the law.

Laws imposing duties on importations of goods, are intended for practical use and application by men engaged in commerce; and hence it has become a settled rule in the interpretation of statutes of this description, to construe the language adopted by the Legislature according to the commercial understanding of the terms used. Again, in the interpretation of all statutes, such construction ought to be given as may best answer the intention which the makers had in view. The intention of the makers of a statute is frequently to be collected from the cause or necessity of making the statute; and it is said by high authority, that " whenever this intention can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction may seem contrary to the letter of the statute." (Elliot vs. Swartwout, 10 Peter's R., 151, 9 Bac. Abr. 239; Kerlin vs. Bull, 1 Dallas R. 178, 9 Bac. Abr. 246, and authorities there cited.)

Now let us enquire what was the intention of the makers of the statute in this case—what did they understand by the term " port in China"? And, furthermore, what is the commercial understanding of this expression ? Of the understanding and intention of the Legislature we have no doubt whatever. Is it reasonable to suppose that it regarded Hong Kong, the port from which the great bulk of Chinese goods were imported into this kingdom at the time of passing the Act, otherwise than as a port in China ? We think not; because, if Chinese goods brought from Hong Kong were to be subject to only five per cent. duty, none would be brought from any other port in China and the Act would thereby have been rendered not merely a

nullity, but an absurdity. To suppose that the Legislature ever regarded Hong Kong in any other light than as a port in China, would be to defeat the very object it had in view. The cause of making the statute was the general opinion which prevailed in our community, that it would be right and proper to increase the rates of duty on Chinese goods, they being considered as mere luxuries, the sale of which interfered with the trade in the more useful and substantial fabrics of other countries; and the intention which the makers had in view was to increase the duties on that class of goods irrespective of the consideration whether they came here direct from Canton, or indirectly through the great entrepôt of Chinese trade—Hong Kong.

In our opinion Hong Kong, within the meaning of the statute, is a port in China, and it is so generally considered commercially, if not geographically, by the whole mercantile world. It is admitted that if these goods had been brought from Macao, they would be subject to the duty of 15 per cent.; but Macao, a Portuguese possession, is no more a port in China than is the British possession of Hong Kong. Macao is a Portuguese possession, and Hong Kong is a British possession, but, nevertheless, they are, commercially speaking, both ports in China. Great Britain herself so regards and treats Hong Kong. She imposes the same duty upon Chinese goods coming from the port of Hong Kong that she does upon the like goods imported from Canton, Shanghae, or any other port in China. Hong Kong is a great commercial entrepôt, or warehouse, where goods are temporarily stored for distribution to all parts of the world, and the fact that Chinese goods pass through this great commercial emporium, on their way to other countries, has no influence whatever on Great Britain, or any other nation, in regulating their tariffs of duties on such goods. Why this government, in fixing its duties, should view Hong Kong in a more favorable light than Great Britain and other nations, we are unable to perceive.

If these goods were the growth or manufacture of Hong Kong, then we admit that they would not be chargeable with a higher duty than five per cent. ad valorem; but being Chinese goods, the case is entirely different.

The point raised upon the construction of the statute has been argued with distinguished ability by the counsel for the plaintiffs, but in our view it is not based upon sound reason; and accordingly we give our judgment in favor of the defendant, with costs.

We take pleasure in saying that since the writing of the above decision, a dispatch has been received from Denmark, in which the Danish government say that it was not the intention of Denmark in negotiating the treaty of 1846, to obtain for herself any greater advantage to Danish ships and merchandise than that granted to the most favored nation; nor to impose any restriction on the Hawaiian government in regard to the prerogative of raising or lowering duties at its own discretion.

That dispatch is in the highest degree honorable to the Danish government, and we subjoin the following extract therefrom : "When Denmark, in the year 1846, concluded a treaty with the Hawaiian kingdom as a state, there could be no sufficient motive to induce the government of the former country to intend, by such a treaty, the acquisition of any greater advantage than that of procuring to Danish

ships and merchandise, at the Sandwich Islands, a treatment *equal* to that granted in the said kingdom to the most favored nations.

"If, therefore, any doubt should happen to rise with regard to the interpretation of any of the articles contained in the said treaty, the Hawaiian government might be convinced that the Danish government would not consider what might be regarded as most profitable to the trade and navigation of this country, but only what must, in the sincere opinion of the same, be regarded as the real intention of the functionaries who, as representatives of their respective governments, had negotiated the said treaty. Such a doubt has now arisen,—it being, as above remarked, a question in what manner the seventh article of the treaty ought, in the future, to be interpreted, according to the mutual opinions of the two negotiators, without any regard to the interpretations put on it by others, either on one or the other side.

"By the decision delivered by the Supreme Court at Honolulu, in the action brought by the said firm against the Hawaiian Exchequer, the expressions of the said article have been interpreted in a manner so as to imply, that Danish productions or other goods on board of or imported in Danish vessels, which are allowed to be imported by the ships of other countries, shall not be prohibited nor pay any higher duties than those levied on productions of the most favored nations, whereas the Hawaiian government averred, that the wording of the said article could not receive any other interpretation than this: that goods imported by Danish ships should be subject to the same duties as are paid by the most favored nation.

"The part of the wording of the said treaty on which the question chiefly depends, is then those words of the seventh article which say, that the there mentioned Danish productions or other goods on board of Danish vessels, ' shall not be prohibited nor pay more than those duties levied on goods of the most favored nation.'

"On a mere perusal of these words without any regard to other matters which might else possibly be worth noticing, His Danish Majesty's government should indeed agree in the interpretation thus established by the said court as the only correct one; but on the other hand, it could not be thought strange, that the Hawaiian government should be of opinion that it had been the intention of the respective representatives of the said contracting powers, in regard to the duty in question, to establish a rule contrary to the interpretation given by the said court; an opinion which might be supported as well by the construction of the said words of the treaty, as especially by the declaration of the Minister of Foreign Relations at Honolulu, who represented the Hawaiian government in negotiating and concluding the said treaty, that, for his part, he had never thought of an interpretation like that established by the Supreme Court as the only correct one.

"The second of the negotiators, the Rear-Admiral Bille has, in his report to this department, declared, that he had in every respect shared the same opinion as to the negotiations and the final conclusion of the said treaty, as that professed by the Hawaiian Minister of Foreign Relations, in addition to which he has further remarked, that it had never been his thought by the said treaty, to impose any restriction on the Hawaiian government, in regard to the prerogative of raising or lowering duties at its own discretion, but that, on the contrary, he would indirectly have the said prerogative acknowledged.

"Such a declaration of His Danish Majesty's representative must naturally have great influence on the interpretation of the said article to be followed in future. But besides this there is another circumstance of great moment which still more corroborates the declaration given by the two representatives, viz: that while the wording of the seventh article of the English original treaty is so dubious, as above shown, the corresponding words of the Danish translation of the treaty, which, like the Hawaiian translation, is annexed to the English original, are clear and evident, saying, that the oft-mentioned Danish productions or goods in Danish vessels, 'Ekke heller skulle betele mere end saadanne Toldafgifter, som i saadant Tilfœlde ere paalagte de meest begunstigede nationer.' " (Nor should pay more than such duties as in the like case are levied on the most favored nations.)

Mr. Montgomery for the plaintiffs.

Mr. Bates for the defendant.